Eric L. Olsen (Idaho State Bar #4811)
ECHO HAWK & OLSEN, PLLC
Post Office Box 6119
Pocatello, ID 83205-6119
Telephone: (208) 478-1624
Facsimile: (208) 478-1670
Email: elo@echohawk.com

Brock Edward Whalen (Texas State Bar #24049316)
(*Pro hac vice filed herewith*)
HOLLAND & KNIGHT, LLP
98 San Jacinto Blvd., Suite 1900
Austin, Texas 78701
Telephone: (512) 472-1081
Facsimile: (801) 998-8077
Email: Brock.Whalen@hklaw.com

*Attorney for Plaintiff*

---

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| POCATELLO COMMUNITY CHARTER SCHOOL, INC., and Idaho non-profit corporation, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendant. | **COMPLAINT FOR TAX REFUND** <br><br> **JURY DEMANDED** <br><br> Case No. 4:25-cv-410 |

## COMPLAINT FOR TAX REFUND

Plaintiff Pocatello Community Charter School ("Plaintiff") brings this action against the

United States of America ("Defendant"), acting by and through the Internal Revenue Service

("IRS"), for a refund of ERCs totaling $427,057.87 plus interest and additional amounts as

provided by law, pursuant to Internal Revenue Code ("I.R.C.") § 7422. To the extent applicable,

Plaintiff also seeks reasonable litigation and administrative costs as permitted by I.R.C. § 7430. In support thereof, Plaintiff alleges:

## PARTIES

1. Plaintiff, the Pocatello Community Charter School, is a school-of-choice based on a charter, serving students from kindergarten through the eighth grade.

2. Plaintiff's principal place of business is located at 995 South Arthur Avenue, Pocatello, Idaho 83204.

3. Defendant is the United States of America.

## JURISDICTION AND VENUE

4. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1346(a)(1).

5. Venue in this Court is proper under 28 U.S.C. § 1402.

6. Plaintiff brings this action under I.R.C. § 7422 to recover refunds of overpaid federal employment taxes, plus interest, for the tax quarters ended March 31, 2021, and June 30, 2021 ("quarters at issue").

7. On or about July 28, 2022, Plaintiff filed Forms 941-X for the quarters at issue seeking employment tax refunds from the IRS.

8. The action is proper under I.R.C. § 6532(a)(1), as more than six months have passed since Plaintiff filed its claims for refund with the IRS.

9. The IRS has not paid Plaintiff for the claimed refunds.

## NATURE OF ACTION

10. Plaintiff files this civil action under I.R.C. § 7422 for the recovery of employment taxes, including the refundable excess credit (together with statutory interest and any appropriate attorney's fees), authorized to be paid to the Plaintiff under § 2301 of the Coronavirus Aid, Relief,

COMPLAINT FOR TAX REFUND - 2

#525018210_v2

and Economic Security ("CARES") Act (Pub. L. No. 116-136, 134 Stat. 281 (2020)) (as amended by § 207(d)(1)(A) of the Taxpayer Certainty and Disaster Relief Act of 2020 ("Relief Act") (Pub L. No. 116-260, 134 Stat. 1182 (2020)) and I.R.C. § 3134.[1]

## BACKGROUND

### A. The Employee Retention Credit

11. Beginning in 2020, the COVID-19 virus created a global pandemic that swept through all fifty states and resulted in governmental orders to address the pandemic that disrupted the United States' local and national economies.

12. Those orders formed a latticework of federal, state, and local government mandates that created a comprehensive regulatory scheme limiting commerce, travel, and group meetings with the objective to limit the spread of COVID-19.

13. The governmental response to that public health emergency involved historically unprecedented measures, including lockdown orders, social distancing mandates, and forced business closures.

14. The economic effects of those policies were profound and the estimated cumulative financial costs of COVID-19 were forecast at $16 trillion. Alvin Powell, *What might COVID cost the U.S.? Try $16 trillion*, THE HARVARD GAZETTE, Nov. 10, 2020, https://news.harvard.edu/gazette/story/2020/11/what-might-covid-cost-the-u-s-experts-eye-16 trillion/.

---

[1] The current version of I.R.C. § 3134 became effective for calendar quarters beginning after September 30, 2020, and, as relevant here, is identical to the version of I.R.C. § 3134 that was in effect during the quarters at issue. For ease of reference, this Complaint references I.R.C. § 3134 when discussing the 2021 ERC requirements.

#525018210_v2

15. In response to the COVID-19 pandemic, the federal government enacted sweeping economic measures to assist American businesses and citizens, including the CARES Act, enacted in March 2020. Section 2301 of the CARES Act created the Employee Retention Credit ("ERC").

16. The ERC is a broad-based, fully refundable tax credit designed to stimulate economic recovery, support job retention, encourage business sustainability, and mitigate the impacts on U.S. businesses from the unprecedented challenges posed by the pandemic.

17. Congress intended for the credit to be broadly applicable to help businesses survive a historic pandemic that disrupted the global economy.

18. The credit is available to eligible employers for the last three quarters of 2020 and for the first three quarters of 2021.

**B.  Threshold Requirement: Carrying on a Trade or Business**

19. An employer is eligible to claim an ERC if it carried on a trade or business during the quarter at issue. I.R.C. § 3134(c)(2).

**C.  Suspension of Business Operations**

20. An employer is eligible for the ERC if the employer's "operation of the trade or business . . . is fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID–19)." I.R.C. § 3134(c)(2)(A)(ii)(I).

21. The CARES Act does not require that a government order directly regulate the partially suspended business. *See generally* I.R.C. § 3134. The language in CARES Act § 2301(c)(2)(A)(ii)(I) and I.R.C. § 3134(c)(2)(A)(ii)(I) contemplates businesses that were constructively suspended through the widespread effects of lockdown orders and similar mandates.

COMPLAINT FOR TAX REFUND - 4                                    #525018210_v2

22. Guidance published in the Internal Revenue Bulletin provides a safe harbor that a business is partially suspended if "more than a nominal portion of its business operations are suspended by a governmental order." *Guidance on the Employee Retention Credit under Section 2301 of the Coronavirus Aid, Relief, and Economic Security Act*, Notice 2021-20, 2021-11 I.R.B. 922, 928 ("Notice 2021-20").[2]

**D.  Qualified Wages**

23. Under I.R.C. § 3134(a), an "eligible employer" is "allowed a credit against applicable employment taxes for each calendar quarter equal to" a percentage of the "qualified wages" paid with "respect to each employee of such employer for such calendar quarter[s]."

24. Under I.R.C. § 3134(c)(3) and (c)(4), "qualified wages" include "wages" as defined by I.R.C. § 3121(a) and certain "health plan expenses."

25. In 2021, eligible employers are allowed a credit against applicable employment taxes for each calendar quarter that is equal to 70 percent of qualified wages paid with respect to each employee of such an employer for such calendar quarter.

26. Under I.R.C. § 3134(b), the maximum amount of qualified wages per employee an employer may take into account for any calendar quarter in 2021 is $10,000.

27. In other words, the maximum credit amount an employer may claim per employee for each calendar quarter in 2021 is $7,000.

---

[2] To the extent that Notice 2021-20 purports to restrict ERC eligibility, it is not controlling law because the notice was not promulgated through the notice-and-comment procedures prescribed in the Administrative Procedures Act, 5 U.S.C. § 553. Further, to the extent that Notice 2021-20 is more restrictive than the relevant statutes concerning ERC eligibility, it is not controlling law because parties may always assail an administrative pronouncement as exceeding the agency's statutory authority in proceedings against them. *See NLRB Union v. Fed. Lab. Rels. Auth.*, 834 F.2d 191, 195 (D.C. Cir. 1987).

COMPLAINT FOR TAX REFUND - 5

## STATEMENT OF FACTS

### A.  Plaintiff's Business Operations Prior to COVID-19 Government Orders

28. Plaintiff is a charter school, organized on November 10, 1998, in the state of Idaho and authorized for students in kindergarten through grade eight.

29. During the relevant time period, Plaintiff operated in one building of approximately 25,800 total square feet located on approximately 4.9 acres of land at 995 South Arthur Street, Pocatello, Idaho 83204 (the "facility").

30. The facility contained thirteen classrooms, two conference rooms, one library and media center, one warming kitchen, one teacher preparation area, one computer lab, one multipurpose room, three administrative offices, five offices for support staff, one gymnasium, and a large outdoor playground space.

31. Prior to the COVID-19 epidemic, Plaintiff's students attended school in person five days a week.

32. One of Plaintiff's primary goals was to give its students the experience and skills to adapt to, learn from, and initiate change.

33. To accomplish this, Plaintiff's child-centered curriculum taught thinking abilities and revolved around the children's questions in any given discipline, with a teacher working as a guide.

34. Plaintiff employed cooperative learning and multiage classrooms to encourage social flexibility and give students experience in adapting to different social situations.

35. Plaintiff also employed the Expeditionary Learning ("EL") concept, which provides extraordinary educational opportunities for students giving them opportunities to develop social flexibility, as well as learning that they, personally, can affect their communities.

#525018210_v2

36. The EL model involved students participating in "learning expeditions". These were purposeful, extensive studies of a single topic, which harnessed the power of adventure and discovery, and led students to become more motivated in their academic work while developing perseverance and self-discipline.

37. The EL approach was furthered through a multitude of events and activities including, but not limited to: Speech Festival (an event where all students recite speeches to peers and judges); Passages (a student's oral defense of their work-product portfolio demonstrating mastery of standards necessary to pass on to the next grade level); Fall Festival; Music Festival; Field Day; Expedition Exhibition; and student-led conferences.

38. As part of the EL model, Plaintiff also maintained an adventure program where, each year, students enjoyed camping, rock climbing and snow-crossing expeditions. In addition to learning through the expeditions themselves, Plaintiff's students also learned by preparing for the expeditions outside of school ("Adventure Program").

39. In connection with Plaintiff's responsibility to create an effective learning environment for its students, Plaintiff operated with an awareness that most students learn best in person with a teacher guiding their instruction.

  #525018210_v2

**B.  Relevant Government Orders**

40.  Government orders issued in response to the COVID-19 pandemic prevented, restricted, or substantially limited conduct of Plaintiff's activities. Specifically, the government orders that impacted Plaintiff's business operations included, but were not limited to, the following:

a.  *State Orders*

*Orders of the Governor of Idaho and the Idaho Department of Health and Welfare*

41. On March 13, 2020, the governor of Idaho issued a proclamation that a state of emergency ("SOE") due to the "occurrence and imminent threat to public health and safety arising from the effects of the 2019 novel coronavirus (COVID-19)" existed in the State of Idaho, thereby triggering a heightened duty by employers to provide safe workplaces for their employees. Though superseded by subsequent proclamations, the substance of the SOE continued in effect until at least October 15, 2021.

42. Effective March 25, 2020, the governor of Idaho ordered the Idaho Department of Health and Welfare ("IDHW") to issue an order for Idaho individuals to "self-isolate" at home ("Order to Self-Isolate").

43. Charter schools, including Plaintiff, were deemed Essential Businesses and were permitted to continue limited operations to "facilitat[e] distance learning or performing essential functions, provided that social distancing of six-feet per person is maintained to the greatest extent possible."

44. Essential Businesses were also required to comply with the Order's "Social Distancing Requirements" to the greatest extent feasible. These requirements included six-foot social distancing between individuals, heightened and more frequent personal hygiene measures, and regular cleaning of high-touch surfaces.

COMPLAINT FOR TAX REFUND - 8                                   #525018210_v2

45. The Order to Self-Isolate was amended and extended, and it remained in effect until May 1, 2020, when it was officially rescinded by the May 1, 2020, Stay Healthy Order (Stage 1).

46. In April of 2020, the State of Idaho began to implement "Idaho Rebounds," which was a phased reopening plan for the state ("Reopening Plan").

47. Generally, there were four stages to the Reopening Plan, Stage 1 being the most restrictive and Stage 4 being the least restrictive.

48. Beginning in the second quarter of 2020, Idaho, like other states, intended to progress through the stages according to the dates originally outlined by the Reopening Plan.

49. However, as infection and transmission rates increased in the third and fourth quarters of 2020 and into the first quarter of 2021, Idaho, again like other states, regressed into earlier stages.

50. Orders issued pursuant to the Reopening Plan were jointly issued by the governor of Idaho and IDHW.[3]

51. On May 1, 2020, IDHW issued Stay Healthy Order (Stage 1). Under this Order, employers were required to:

    a. Implement six-foot social distancing of all individuals, including employees, "whenever possible";

    b. "Provide adequate sanitation and personal hygiene" for all individuals on premises, including employees;

    c. "Frequently disinfect commonly touched and high-traffic areas and regularly clean those areas";

---

[3] For ease of reference, this Complaint identifies the IDHW as the governmental authority issuing the relevant orders.

d.   "Identify how personal use items such as masks, face coverings, and gloves may be required by employees, vendors, and/or patrons";

e.   Minimize "close interactions with patrons";

f.   "Identify strategies for addressing ill employees, which should include requiring COVID-19 positive employees to stay at home while infectious, and may include keeping employees who are directly exposed to the COVID-19 positive employee away from the workplace, and the closure of the business until the location can be properly disinfected";

g.   Implement other practices appropriate to the employer's specific type of business, including screening employees for infection or exposure to COVID-19; and

h.   Implement other protocols developed pursuant to Idaho Rebounds.

52. Gatherings of any size, whether "public or private," were to "be avoided."

53. Violations of the May 1, 2020, Order were expressly punishable by fine, imprisonment, or both.

54. Cities, counties, and public health districts (*e.g.*, Southeastern Idaho Public Health district ("SIPH"), also known as "District 6") were permitted to "enact more stringent public health orders than those set out in the [May 1, 2020] Order."

55. Effective May 16, 2020, IDHW issued Stay Healthy Order (Stage 3). Under this Order, requirements for employers remained the same as under the May 1, 2020, Order, but added that "[g]atherings" of more than 10 individuals were to "be avoided." Those gatherings that were held were required to, amongst other measures, maintain six-foot social distancing between individuals "whenever possible," implement heightened personal hygiene measures, and "regularly clean high-touch surfaces." Like the May 1, 2020, Order, violations of the May 16, 2020, Order were

expressly punishable by fine, imprisonment, or both And, like the May 1, 2020, Order, cities, counties, and public health districts were permitted to "enact more stringent public health orders than those set out in this [May 16, 2020] Order."

56. Effective May 30, 2020, IDHW issued Stay Healthy Order (Stage 3). Under this Order, requirements for employers remained unchanged from the May 1, 2020, and May 16, 2020, Orders. Gatherings of 50 or more people were to "be avoided," but those gatherings that were held were required with the requirements that remained unchanged from the May 16, 2020, Order.  Like previous Stay Healthy Orders, violations of the May 30, 2020, Order were expressly punishable by fine, imprisonment, or both, and cities, counties, and public health districts were permitted to "enact more stringent public health orders than those set out in this [May 30, 2020] Order."

57. On June 11, 2020, IDHW issued Stay Healthy Guidelines (Stage 4).  Required measures for employers remained unchanged from prior Stay Healthy Orders.  Further, "gatherings" of any size were permitted, but organizers of such gatherings were to adhere to physical distancing and sanitation measures, as were also outlined by the May 16, 2020, and May 30, 2020, Orders.

58. Effective October 27, 2020, IDHW issued Stay Healthy Order (Stage 3). Under this Order, requirements for employers, as outlined in the May 1, 2020, May 16, 2020, and May 30, 2020, Orders, remained unchanged. Further, the October 27, 2020, Order required non-participant attendees of extracurricular activities (e.g., athletic matches and extracurricular performances) to, as in earlier Orders, maintain six-foot social distancing between individuals, implement heightened personal hygiene measures, and "regularly clean high-touch surfaces." Further, the 50-person limitation on indoor gatherings and 25% capacity limitation on outdoor gatherings applied to non-participant attendees.  Like previous Stay Healthy Orders, violations of the October 27, 2020, Order were expressly punishable by fine, imprisonment, or both.  Further "cities, counties, public

health districts, school districts, and institutions of higher education" were permitted to "enact more stringent public health orders than those set out in this [October 27, 2020] Order."

59. Effective November 14, 2020, IDHW issued Stay Healthy Order (Stage 2). Under this Order, the requirements for employers, gatherings, and extracurricular activities, as outlined in the October 27, 2020, Order, remained relatively unchanged.  However, a 10-person limit on gatherings, whether indoor or outdoor, applied to non-participant attendees.  Like previous Stay Healthy Orders, violations of the November 14, 2020, Order were expressly punishable by fine, imprisonment, or both.  Further "cities, counties, public health districts, school districts, and institutions of higher education" were permitted to "enact more stringent public health orders than those set out in this [November 14, 2020] Order."

60. Effective December 30, 2020, the IDHW issued Stay Healthy Order (Stage 2). Under this Order, the requirements for employers, gatherings, and extracurricular activities, as outlined in the October 27, 2020, and November 14, 2020, Orders, remained relatively unchanged. However, schools were not required to comply with the 10-person limitation on non-participant attendees if they "complie[d] with a plan administered and enforced by" the Idaho State Board of Education ("SBE").

61. Effective February 2, 2021, IDHW issued Stay Healthy Guidelines (Stage 3). Under this Order, requirements for employers, gatherings, and extracurricular activities remained relatively unchanged from prior orders, including the December 30, 2020, Order.

62. Effective May 11, 2021, IDHW issued Stay Healthy Guidelines (Stage 4). Under this Order, requirements for employers and gatherings remained relatively unchanged from prior orders, including the February 2, 2021, Order.  Similar to prior orders, including the December 30, 2020, and February 2, 2021, Orders, gatherings were permitted if they adhered to "Physical

Distancing and Sanitation Requirements," which included six-foot social distancing; holding events outdoors, if possible; monitoring local COVID-19 infection rates "to inform planning"; and excluding sick event staff or hosts.

*Idaho Department of Education and State Board of Education Orders*

63. From March 23, 2020, through the end of the 2019-2020 school year, the Idaho State Board of Education ("SBE") ordered and maintained a "soft closure" of Idaho schools. This generally meant that, during this period of time, school was not conducted in-person and any on-site operations were subject to IDHW's orders that were in effect during this period.

64. For instance, on March 23, 2020, the SBE issued COVID-19 School Operations Guidance requiring schools, including charter schools, to follow "national CDC guidelines pertaining to large gatherings and social distancing."

65. The Idaho Department of Education also issued guidance during this period detailing how such IDHW orders were to be implemented in Idaho K-12 schools.

66. After the soft closure that extended from March 2020 through the rest of the 2019-2020 school year, several different governmental authorities or agencies in Idaho collaborated to develop the Idaho Back to School Framework 2020 ("Reopening Framework").

67. Among the contributing authorities were the governor, the SBE, the Idaho Department of Education, IDHW, and Idaho's local public health districts, including Southeastern Idaho Public Health district ("SIPH").

68. The SBE adopted the Reopening Framework on July 9, 2020, and the measures outlined within it were applicable to Idaho K-12 schools' operations during the 2020-2021 school year.

69. The Reopening Framework identified expectations, guidelines, and best practices to support local governance and the successful completion of the 2020-2021 school year, delivering on Idaho's constitutional obligation for a free, uniform, and thorough public education system.

70. The Reopening Framework outlined measures that schools were required to take to minimize the risk of COVID-19 transmission and keep all individuals on the campus, including students, teachers, and staff, safe.

71. The Reopening Framework mandated that "school districts and charter schools will use this framework to help guide their response based on their local community's situation." Specifically, guidance within the Reopening Framework was governed by the level of transmission/risk in the community—Categories 1, 2, and 3, with Category 1 being the lowest risk category and requiring the least restrictive measures, and Category 3 being the highest risk category and requiring the most restrictive measures.

72. Under Category 1 transmission/risk conditions, schools were required to:

   a. Coordinate with local health officials to develop prevention and mitigations plans;

   b. Implement a reasonable and feasible infection control plan for a safe workplace;

   c. Clean/disinfect frequently touched surfaces at least daily and shared objects after each use;

   d. Conduct deep cleaning of schools prior to students/staff returning; schedule periodic cleanings during weekends or school holidays/breaks (to the extent practicable);

   e. Provide adequate supplies for more frequent and heightened personal hygiene;

   f. Prepare to address all families' and students' needs if a transition to hybrid/blended or remote is required;

#525018210_v2

g.  Conduct cleaning of cafeterias and high-touch surfaces throughout the school day;

h.  Determine capacity for production and service of student meals;

i.  Determine maximum number of people per room/gathering, and spacing;

j.  Evaluate school food service preparation facilities and structures for availability to continue operations;

k.  Limit field trips to areas with no community transmission;

l.  Clean and disinfect frequently touched surfaces on the bus at least daily;

m.  Space students by family groups on buses; and

n.  Air out and deep clean buses when not in use.

73. Under Category 2[4] transmission/risk conditions, schools were required to:

a.  Conduct daily health screenings of employees and students for COVID-19 symptoms upon entry to the facility;

b.  Isolate and send home students and staff that show symptoms;[5]

c.  Establish a protocol for screening visitors and volunteers;

d.  Close off areas used by a sick person and do not use before cleaning and disinfection. Wait 24 hours before you clean or disinfect if possible. If it is not possible to wait 24 hours, wait as long as possible. Ensure safe and correct application of disinfectants;

e.  Implement physical distancing and remote/blended learning as determined by the local school Board/ Board of Directors, including:

_____

[4] The Framework specified that an individual category's measures included those of a preceding category. So, Category 1 measures are incorporated into Category 2 measures, and Categories 1 and 2 measures incorporated into Category 3.

[5] The Framework here directed schools to CDC guidelines.

#525018210_v2

i.    Use the master schedule to balance class numbers as much as possible –
      remove unused desks and furniture in classrooms; maximize social
      distancing (to the extent practicable);

ii.   Limit physical interaction through partner or group work;

iii.  Establish distance between the teacher's desk/board and students' desks;

iv.   Identify and utilize large spaces (e.g. gymnasiums, auditoriums, outside
      spaces – as weather permits) for social distancing;

v.    Consider targeted distance/remote learning;

vi.   Consider A/B schedules (i.e., students attend half of their classes on "A"
      days and the other half on "B" days);

vii.  Consider hybrid instructional Models if absolutely necessary and after
      factoring in additional logistical requirements/costs including childcare
      requirements placed on working families and unnecessary burden on staff;

viii. Consider allowing special education students to continue in-person
      instruction as these students often rely on daily routines and social
      interactions to address their individual learning needs;

ix.   Variety of effective communication to provide support for parents and
      students especially in the remote areas such as using Spanish radio, social
      media platforms, group texting, etc.; and

x.    Distribute printed instructional packets/materials and district/school
      communications along with meals; designate and communicate
      collection/drop off points;

f.    Use disposable plates, utensils, etc. if applicable and practical;

COMPLAINT FOR TAX REFUND - 16                                    #525018210_v2

g.   Conduct cleaning of cafeterias and high-touch surfaces throughout the school day;

h.   Implement an alternative serving model, including serving meals in classrooms or serving meals in cafeteria with social distancing and staggered meal periods;

i.   Avoid sharing of foods and utensils;

j.   Screen students and bus drivers for symptoms of illness and utilize spaced seating (to the extent practicable);

k.   Eliminate field trips;

l.   Clean and disinfect frequently touched surfaces on the bus at least daily;

m.   Establish protocols for bus stops, loading/unloading of children from different households; and

n.   Confer with CDC Guidance titled "What Bus Operators Need to Know".

74.   Under Category 3 transmission/risk conditions, schools were required to:

a.   Continue coordination with local health officials;

b.   Make considerations for family support for packets being sent home or online instructions for economically disadvantaged and English language learner student families. Provide resources and instruction on how to use platforms and navigate software. Use of bilingual instructional paraprofessionals to work with family and students on packets or navigating the online program;

c.   Provide professional development opportunities for parents, students, and teachers regarding mental health illness and support;

d.   Practice established social distancing protocols to the greatest extent practicable;

e.   Reduce contact by delivering a week's worth of meals during a designated time;

f.   Suggest using transportation for meals to deliver to students while school is closed;

COMPLAINT FOR TAX REFUND - 17

g.   Limit transportation of small groups of students from same family that need to come to school facilities to receive services;

h.   Sanitize buses between groups of students; and

i.   Schedule delivery/pick-up in ways that reduce contact to the number of students and families.

75. The Framework also outlined telework measures for teachers and staff; required development of a contact tracing protocol for when students or staff in the building tested positive; and provide heighted supports and interventions for all students, including special education students, those requiring accommodations pursuant to a 504 plan, and English language learners.

2.   *Regional or Local Governmental Orders*

*Southeastern Idaho Public Health District*

76. Southeastern Idaho Public Health District ("SIPH") is the governing public health district for Bannock County, which is where Plaintiff's facility is located and Plaintiff operates.

77. Effective July 24, 2020, SIPH issued its COVID-19 Regional Response Plan ("Response Plan"), which was developed by SIPH as Idaho initially transitioned from a state-level response to a more targeted regional response.

78. The Response Plan established four risk level categories, which outlined recommended mitigation strategies according to infection rate in the community: Green (Minimal Risk); Yellow (Moderate Risk); Orange (High Risk); and Red (Critical Risk).

79. The Response Plan provided that "schools should implement strategies in response to these guidelines and those of Idaho Back to School Framework 2020" at all risk levels.

COMPLAINT FOR TAX REFUND - 18

80. SIPH monitored community infection rates during the third and fourth quarters of 2020 and the first, second, and third quarters of 2021, and assigned risk levels on a per-county basis according to infection rate.

81. As relevant here, SIPH determined that Bannock County was at the Orange level from at least November 5, 2020, through at least January 15, 2021; at the Yellow level from at least January 29, 2021, through February 26, 2021; and at Green level from at least March 15, 2021, through July 16, 2021.

82. However, as acknowledged by SIPH, the available risk level categories were outdated as of July 1, 2021, and did not reflect the "dramatic resurgence" of COVID-19 infection rates in Idaho counties. In fact, Bannock County was again in the highest CDC risk level as of August 19, 2021.

> 3. *Federal Government Orders*

83. Plaintiff was also subject to orders issued by federal agencies, including the Centers for Disease Control and Prevention ("CDC"), the U.S. Department of Education ("DE"), and the Occupational Safety and Health Administration ("OSHA").

<u>U.S. Centers for Disease Control and Prevention</u>

84. Throughout the tax periods at issue, the CDC issued assorted guidance that outlined measures that K-12 schools could use to protect the health of safety of its students, teachers, staff, and administrators and slow the spread of COVID-19.

85. The guidance was updated continuously to align with updated knowledge and understanding of the virus and science.

86. For example, by January 1, 2021, the CDC's mitigation strategies for schools included:

  a. Reviewing, updating, and implementing emergency operations plans that incorporate, amongst other things, monitoring local COVID-19 data in the local

community; developing systems to share relevant information with stakeholders; adopting mitigation strategies to promote healthy behaviors; and establishing criteria (in consultation with local officials) for when a school will suspend in-person learning;

b.  Requiring students and staff to stay home when sick or exposed to COVID-19;

c.  Increasing monitoring of students and staff "to ensure adherence" with 20-second handwashing with soap and water;

d.  Teaching and reinforcing masking by students and staff;

e.  Ensuring adequate supplies for personal hygiene by students and staff, including soap, a way to dry hands, tissues, 60%-alcohol hand sanitizer, disinfectant wipes, masks, and no-touch/foot-pedal cans;

f.  Posting signs that promote everyday protective measures and describe how to stop the spread of COVID-19;

g.  Developing a schedule for increased daily routine cleaning and disinfection, including frequently touched surfaces and school buses;

h.  Discouraging the sharing or items and minimizing sharing of high touch materials;

i.  Upgrading ventilation and circulating air more often;

j.  Modifying the layouts of classrooms and other areas to maximize physical distancing;

k.  Installing physical barriers and providing physical guides for traffic control;

l.  Closing communal spaces and having students eat outdoors or in classrooms (as feasible);

#525018210_v2

m.  Implementing operational changes to the school day, including cohorting students, alternating and staggering the school schedule, limiting gatherings (including sporting events), visitors, and field trips, and limiting nonessential travel;

n.  Designating a COVID-19 point of contact;

o.  Cross-training staff and implementing flexible sick leave policies and practices for when staff must stay home; and

p.  Planning and implementing general measures for when someone was or became sick with COVID-19 while at schools, including making sure staff and students stay home, isolating sick individuals until they can go home, cleaning and disinfecting areas where infected individuals were, and mandatory reporting.[6]

87. In February 2021, the CDC issued further guidance that reinforced strategies outlined above. For example, the guidance emphasized that "it is critical that schools use and layer mitigation strategies" and identified and promoted five key, essential mitigation strategies:

a.  Universal and correct use of masks;

b.  Physical distancing (of at least six feet), implemented through various strategies such as cohorting students, staggering the school schedule, alternating schedules, limiting nonessential visitors, and installing physical barriers;

c.  Handwashing and respiratory etiquette;

d.  Cleaning and maintain healthy facilities; and

e.  Contact tracing in combination with isolation and quarantine.

---

[6] *Id.*

COMPLAINT FOR TAX REFUND - 21

88. On March 21, 2020, the CDC also outlined measures all employers should take to ensure the health and safety of their employees, which complemented the school-specific measures, including:

      a.   Requiring actively or potentially sick employees to self-quarantine;

      b.   Screening employees at the workplace for COVID;

      c.   Providing face coverings and sanitizing materials;

      d.   Implementing and enforcing social distancing policies/protocols to minimize close contacts, including implementing flexible worksites and work hours; and altering physical workspaces to maximize distance between employees;

      e.   Canceling, adjusting, or postponing large work-related meetings or gatherings that can only occur in-person;

      f.   Performing routine and enhanced cleaning and sanitizing of high-touch surfaces;

      g.   Implementing flexible sick leave and supportive policies and practices; and

      h.   Educating and training their employees about COVID-19 best practices.

89. The CDC updated their strategies for employers in May 2020, including implementing daily health checks, wearing cloth face masks in the workplace, implementing policies/practices for social distancing in the workplace, and improving ventilation.

90. The CDC guidance also directed employers to OSHA guidance that reinforced CDC measures and that was tailored according to the risk of transmission in specific workplaces.

91. The business and employer guidance was continuously expanded and updated throughout 2020 and the first three quarters of 2021.

*U.S. Department of Education*

#525018210_v2

92.  The U.S. Department of Education ("DE") issued COVID-19 guidance specific to schools' operations in February 2021 to "aid educators in implementing the [CDC's] *Operational Strategy for K-12 Schools through Phased Mitigation (K-12 Operational Strategy)* by addressing common challenges and providing practical examples."

93.  That guidance emphasized similar measures from the CDC guidance, accordingly, including universal and correct use of masks; implementing strategies to maximize social distancing of at least six feet between individuals in school; cohorting students; adopting protocols in school buses to maximize physical distancing; requiring students and staff to quarantine or isolate if exposed to COVID-19; teaching and enforcing handwashing and respiratory etiquette; and prioritizing in-person learning over in-person extracurricular activities and athletic programs.

94.  The DE's guidance was updated and in effect throughout the first, second, and third quarters of 2021.

*U.S. Occupational Safety and Health Administration*

95.  Throughout the COVID-19 pandemic, the U.S. Occupational Safety and Health Administration ("OSHA") required employers to follow guidance from CDC, OSHA, and local authorities.

96.  From early in 2020, OSHA recognized the risk of exposure to COVID-19 in all work settings. In April of 2020, OSHA issued guidelines that required employers to create strict protocols to prevent the spread of COVID-19.

97. In January 2021, OSHA also issued standards that reinforced CDC protocols.[7] This mandatory guidance outlined COVID-19-specific measures to be implemented in all workplaces.

---

[7] OSHA originally released guidelines, *Protecting Workers: Guidance on Mitigating and Preventing the Spread of COVID-19 in the Workplace*, with the assistance of the CDC, on January 29, 2021, with updates on June 10, 2021, and August 13, 2021. These mandatory OSHA standards

Employers were warned of OSHA inspections focused on areas experiencing elevated levels of COVID-19 transmission. These inspections were "to ensure safe and healthy conditions" were being met for employees.

98. Additionally, these mandatory guidelines reiterated other OSHA standards applicable to addressing COVID-19 in the workplace, citing Federal law and regulations as support.

### C. Plaintiff's Business Operations Were Impacted by Government Orders

99. Government orders discussed above prevented, restricted, or substantially limited conduct of Plaintiff's activities and thereby caused a full or partial suspension of Plaintiff's business operations during the quarters at issue.

100. Specifically, Plaintiff implemented a hybrid instructional model in which half of its students attended school in person on only Mondays and Thursdays while the other half attended school in person on Tuesdays and Fridays ("hybrid model"). Under the hybrid model, Wednesdays were used for teacher planning days and were also days on which teacher met with students virtually on a one-on-one basis.

101. Further, each time Plaintiff learned of a student or staff member becoming infected by COVID-19 infection, students and staff who had been in contact with the infected person were quarantined and were not able to attend school ("quarantining"). This meant that Plaintiff attempted to provide educational services to those students 100 percent virtually for between 5 and 10 days. Attendance rates for students in the virtual environment were very poor and, in several

---

were issued to "assist employers in providing a safe and healthful workplace." These guidelines included sending those exposed to COVID-19 home, implementing social distancing policies, providing adequate COVID-19 training to employees, mandatory reporting, and increasing the frequency and intensity of cleaning and disinfecting. This mandatory guidance is still active on the OSHA website today. *See id.*, https://www.osha.gov/coronavirus/safework (last visited May 21, 2025).

#525018210_v2

instances, resulted in an entire class being absent from school. At one point in time, more than half of Plaintiff's school was quarantined, causing Plaintiff to suspend in-person teaching for the remainder of that school week.

102. The hybrid program and quarantining protocols during the quarters at issue reduced in-person teaching significantly and caused learning growth and academic progress to be far lower than in a typical school year.

103. Also, Plaintiff repurposed its gymnasium for use by students who did not have support for at-home or virtual learning. Specifically, Plaintiff purchased and placed tables and chairs in its gymnasium. Two students were seated at opposite ends of each table, and Plaintiff hired Educational Assistants who provided support to students that was similar to how parents were expected to support their at-home students. This resulted in the gymnasium being unavailable for physical education class or other school functions that would typically occur there.

104. Plaintiff also diverted economic resources to pay a 30 hour-per-week employee to clean and disinfect the school and an additional 10 hour-per week-employee to work in the library sanitizing books for student use.

105. Also, students were not permitted to use the designated room for lunches. Rather, students were required to eat lunches in their classrooms. This diverted teachers' work from preparing and delivering educational instruction to their students to supervising students during lunch and doing post-lunch cleanup of their classrooms.

106. Further, teachers were required to disinfect their classrooms throughout the day, which also diverted teachers' work from preparing and delivering educational instruction to their students.

107. Plaintiff staggered admission and release times to limit number of bodies in the hallway, further reducing the amount of time that Plaintiff's teachers were able to deliver educational instruction to their students.

108. Plaintiff's teachers and its administrator were unable to attend the annual National EL Education conference, which enhances the education Plaintiff provided to its students by providing professional development for Plaintiff's teachers.

109.  Plaintiff was not able to hold its usual Annual Speech Festival. The Speech Festival was an annual competitive event where all students grades kindergarten through eighth prepared and recited speeches to a live audience of peers and judges.

110. As a result of the conditions described above, Plaintiff's business operations were fully or partially suspended due to orders from governmental authorities during the quarters at issue.

111. More than six months have passed since Plaintiff filed its ERC Refund Claims.

112. The IRS has not issued ERC Refunds for the quarters at issue nor has it disallowed the ERC Refund Claims.

## COUNT ONE:  QUARTER ONE OF 2021

113. Plaintiff incorporates by reference paragraphs one through one hundred twelve.

114. On or about July 28, 2022, Plaintiff timely filed a Form 941-X, *Adjusted Employer's Quarterly Federal Tax Return or Claim for Refund*, claiming the ERC for the first quarter of 2021 ("Q1 2021 Form 941-X").

115. Line 18a of the Q1 2021 Form 941-X reported that Plaintiff's nonrefundable portion of the ERC was $23,982.29.

116. Line 26a of the Q1 2021 Form 941-X reported that Plaintiff's refundable portion of the ERC was $194,480.49.

#525018210_v2

117. Line 30 of the Q1 2021 Form 941-X reported $312,089.68 in qualified wages for the ERC.

118. Plaintiff paid wages and compensation to its employees during the first quarter of 2021.

119. Plaintiff is an eligible employer for the ERC because government orders partially suspended Plaintiff's business operations during the first quarter of 2021 within the meaning of the I.R.C. § 3134.

120.  Based on the foregoing, Plaintiff is entitled to a refund of $218,462.78 for the first quarter of 2021.

### COUNT TWO:  QUARTER TWO OF 2021

121. Plaintiff incorporates by reference paragraphs one through one hundred twelve.

122. On or about July 28, 2022, Plaintiff timely filed a Form 941-X, *Adjusted Employer's Quarterly Federal Tax Return or Claim for Refund*, claiming the ERC for the second quarter of 2021 ("Q2 2021 Form 941-X").

123. Line 18a of the Q2 2021 Form 941-X reported that Plaintiff's nonrefundable portion of the ERC was $25,929.24.

124. Line 26a of the Q2 2021 Form 941-X reported that Plaintiff's refundable portion of the ERC was $ 182,665.86.

125. Line 30 of the Q2 2021 Form 941-X reported $297,992.99 in qualified wages for the ERC.

126. Plaintiff paid wages and compensation to its employees during the second quarter of 2021.

127. Plaintiff is an eligible employer for the ERC because government orders partially suspended Plaintiff's business operations during the second quarter of 2021 within the meaning of the I.R.C. § 3134.

128.  Based on the foregoing, Plaintiff is entitled to a refund of $208,595.09 for the second quarter of 2021.

## JURY DEMAND

129. Plaintiff demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court grant judgment in its favor against the Defendant for:

a.   A refund in the amount of $427,057.87 or such other amount as the Court determines to be refundable, plus statutory interest on that amount as provided by law;

b.   Reasonable litigation and administrative costs, including attorney's fees, as allowed by law; and

c.   All further relief the Court deems appropriate.

DATED this 25th day of July, 2025.

ECHO HAWK & OLSEN, PLLC


*/s/ Eric L. Olsen*
Eric L. Olsen
*Attorney for Plaintiff*

COMPLAINT FOR TAX REFUND - 28

#525018210_v2